R. A. Smith v. J. T. Russell.

Decided May 2, 1900.

**1.  Assignment of Error.**

An assignment asserting error in the overruling of six different special exceptions, raising separate and distinct questions as to the sufficiency of the adversary's pleading, will not be considered.

**2.  Evidence—Certificate by State Officer.**

A certificate by the State Treasurer of the deposit of money for purchase of school land showing that it was returned because advised by the Commissioner of the General Land Office that the application was rejected because a prior application was on file, is no evidence of the facts so learned by the Treasurer from another office.

**3.  Same—Indorsements in Land Office.**

A mere unsigned memorandum made in the Land Office on the back of an application to purchase school land is no evidence of the truth of the facts noted in such memorandum.

**4.  Purchase of School Land—Facts Showing Applicant an Actual Settler.**

See opinion for evidence held sufficient to establish the status of an applicant to purchase school land as an actual settler.

Appeal from Runnels.  Tried below before Hon. J. O. Woodward.

*Harris & Smith,* for appellant.

*R. B. Truly* and *Sims & Snodgrass,* for appellee.

Key, Associate Justice.—This action involves the title to a section of school land.  There was a nonjury trial, resulting in a judgment for the plaintiff, and the defendant has appealed.

The first assignment reads as follows: "The court erred in overruling defendant's first, second, third, fourth, and fifth special exceptions to plaintiff's first amended original petition herein; and the court also erred in overruling the defendant's special exception to plaintiff's first supplemental petition."

Appellee objects to this assignment being considered on account of its generality, and the objection must be sustained.  Rule 26; Cannon v. Cannon, 66 Texas, 682; Railway v. Donovan, 86 Texas, 378.  The exceptions referred to in the assignment raised separate and distinct questions concerning the sufficiency of appellee's pleading; and, under the decisions cited, it is not permissible to present them all in one assignment of error.

The plaintiff claimed title as an actual settler, etc.  His application to

purchase was made August 23, 1897; and at the same time he executed his obligation to pay the State the purchase money in the manner prescribed by the statute.    August 27, 1897, he deposited in the State treasury $17, covering the first payment on the land as required by law. The certificate of the treasurer, showing that this deposit was made, shows that on October 20, 1897, the money was returned to the plaintiff, for the reason as stated in the certificate, "that the Commissioner of the General Land Office, under date of October 14, 1897, advised this office of his rejection of the application of said J. T. Russell to purchase said section No. 520, certificate No. 123a, B. B. B. & C. R. R. Co., in Runnels County, 'for the reason that a prior application was on file.' "    And on the back of the plaintiff's application to purchase were pencil memoranda reading thus:    "Rejected. on mkt. 8/23/97 R. A. Smith filed 8/23/97 as addl. land refunded 10/11/97."

It is contended, on behalf of appellant, that these memoranda and the certificate of the State Treasurer, as quoted above, show a prior right in appellant to the land, and that appellee's application to purchase was properly rejected.

Such is not our view of the matter.    The indorsement referred to was not signed by anyone officially or otherwise, and was not evidence of any fact.    Nor was the statement of the Treasurer as to information received by him from the Commissioner of the Land Office proof of the fact that appellant or anyone else had made a prior application to purchase the land.

The only other question for decision is the sufficiency of the evidence to support the finding that appellee was a bona fide settler on the land at the time he made his application to purchase.    He was the only witness who testified, and his evidence is as follows:    "I reside on section No. 520, certificate No. 123a, B. B. B. & C. R. R. Co., in Runnels County, Texas.    I have resided there ever since about the 12th day of August, 1897.    About that time I had no land of my own.    I learned that this land would be forfeited and placed upon the market for sale under the law governing State school lands.    I took my wagon and team and a load of lumber, about sixteen or twenty pieces, 1x6, and went by Mr. Laxon's, got him, and went upon the land for the purpose of improving it and making it my permanent home.    I had asked the defendant about land that was likely to be placed on the market, and he informed me that this land, would be a section which I could get.    He told me how I could find it.    After I had unloaded the lumber on the land near where I expected to build my house and barn lots, etc., I went with Mr. Laxon around the land to look at its situation, etc.    I took with me some quilts, a barrel, skillet, coffee pot, and provisions.    I had a place near Ballinger rented and had a crop of cotton and feed on it, and had the use of it to gather my crop, if necessary, till the 1st day of January, 1898.    I was not able, for want of means and time from my cotton crop, to move my family on the land in dispute at once and had no place suitable for my family to stay when I first went there.    I did go back there, however,

and improve the land, such as building fences, cutting posts, digging postholes, etc., and my house as fast as I could. I could not do without my crop on the rented place where my family was staying, and was compelled to go back and forth between the rented place and my home place in order to gather my crop and to provide a house and place to put my crop on my new home place.

I stayed all night on the new home place one night before I made application to purchase it on August 23, 1897; left my cooking things and bed clothes there with some provisions, and went back there every day or two, cutting and skinning posts and digging postholes, until after I had made my application to file on the land. As soon as I could get my crop out on the rented place and build a house, I moved my family on my home place. I made a field, plowing and putting in cultivation about fifty-five acres. Have a residence on it of two rooms sixteen feet square; have a barn, horse and cow lots; garden place, a well and other improvements, all made as fast as I could make them after I had filed on the land and gathered my crop on the rented place. I moved my family on my present home place as soon as I could provide shelter for them in the way of a house, and that was about the latter part of December, 1897. But I had been building, working on the land every chance I had, before that. It was necessary for my family to be on the rented place, as I needed the crop to build my new house and to pay for the land, as I had no other means; and as the weather was getting cold, I had to shelter my family from the weather. Myself and family have continuously been living on the land in dispute ever since, and I have been enjoying and cultivating it as my own exclusive home. No other person is interested in the land but myself. When I first went on the land it was vacant and claimed by no person that I heard of. While living there I was not disturbed, and have been living there quietly and peaceably, and had no idea my claim and right was disputed until I heard in October, 1897, that my land had been awarded by the Land Commissioner to R. A. Smith, when I brought this suit to clear my title and remove any cloud cast upon the same by defendant R. A. Smith. Before I made application for my home place in August, 1897, I built a sort of house by putting up four walls nailed to posts at each corner which I had cut and placed there, and I covered this with a wagon sheet when I first came upon the land. This remained and was used for shelter in keeping my things in until my house was built."

Cross-examined: "I testified in the case of Thompson Bros. v. Hubbard, at the last term of this court, but did not testify that I lived on section 150 about three miles northeast of Ballinger during all of that year. I testified that I lived there until about the 13th of August. Section No. 150, that I farmed that year, is about three miles northeast of Ballinger, and section No. 520, which I applied to purchase and upon which I now reside, is about nine miles south of Ballinger, in R. A. Smith's pasture. On the farm I had rented that year I had some corn, sorghum, millet, small grain, and thirty acres of cotton. I began picking

the cotton the last of August or the 1st of September; my wife, myself, and little boy picked, and I think I hired two or three boys to help us pick the cotton. We got through about Christmas. I cut my sorghum in October, and we moved to the section upon which we now live about the 6th of January, 1898. I went to the land in controversy either the 12th, 13th, or 14th of August, 1897, in a wagon. When I reached Mr. Laxon's house he went with me. I unloaded my wagon on the ground, put the cooking utensils in the barrel, and put the three quilts and wagon sheet in the barrel; then rode around the land and came back home. The next day I went back horseback and took a package of coffee, a half sack of flour, 25 cents worth of potatoes, 10 cents worth of onions, and 25 cents worth of bacon. I cooked and eat dinner that day on the place. I cut some posts, and with the lumber I had taken down built a pen about four and one-half feet high and fourteen feet square and put my things in it and stretched the wagon sheet over one corner of it. I went down again on the 19th and stayed all night and cut a few posts, and came back next morning to my family. I did not come to town any more until the 23d, when I filed on the land. I went down to the section of school land on the 27th of August, and then did not go any more until I moved my family there, about the 6th of January, 1898. My family consists of a wife and one child, and they lived all the year of 1897, and until the 6th day of January, 1898, on the farm I had rented northeast of Ballinger. I never took them to the land in controversy until about the 6th of January, 1898. All of our household effects, except those I enumerated which I carried to the land in controversy, remained where I lived on the rented farm; all of our beds, bedding, except three quilts mentioned, bedstead, stove, kitchen furniture, trunks, wearing apparel, chickens, cows, and farming implements remained on the farm we had rented until I moved my family to the land in controversy, about January 6, 1898, and I ate and slept with my family on the farm all of the time except as above stated. I did not get through gathering my crop till about Christmas. When I went down to the land in controversy, August 19th, horseback, I carried a bundle of sorghum to feed my horse with. After I went there on the 27th of August I presume I was busy gathering my crop until I moved my family out on the 6th of January. I sent my application to purchase and money for first payment by mail from Ballinger. About the 18th of October, 1897, I received notice from the land office that the section of land in controversy had been awarded to the defendant R. A. Smith. All of the improvements made by 'me on said section, except the building of the pen and the cutting of forty or fifty posts, were made by me after I had knowledge that said land had been awarded to R. A. Smith, the defendant. When the money was returned to me which I sent to the State Treasurer to cover first payment, I again returned it to him, and have not heard from it since."

Redirect: "I had no money to build the house on said section until I got it out of the crop I raised that year, and I had to gather said crop and get the money out of it to build with. The reason I did not take

my family at first on the land was because I had to leave them to take care of my crop on the rented place and to help gather the crop, and because I was not able to build until I had gathered my crop."

This evidence is stronger than that which was held in Busk v. Lowrie, 86 Texas, 129, not to show actual settlement at the time application to purchase was made. It is more like Willoughby v. Townsend, 51 Southwestern Reporter, 335, in which this court held there was sufficient proof of actual settlement, and Wilgus v. Arnold, 29 Southwestern Reporter, 823, in which the Court of Civil Appeals for the First District made a similar ruling. See also Thomas v. Porter, 57 Texas, 60.

We can not say that the finding of the trial court in appellee's favor on that issue is not supported by evidence.

No reversible error is shown and the judgment will be affirmed.

*Affirmed.*

Writ of error refused.